JOSEPH S. KEELTY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Keelty v. Commissioner
Docket No. 3405-82.
United States Tax Court
T.C. Memo 1984-173; 1984 Tax Ct. Memo LEXIS 502; 47 T.C.M. (CCH) 1455; T.C.M. (RIA) 84173; April 4, 1984. Herbert S. Garten and Sheldon G. Dagurt, for the petitioner. Clare J. Brooks and Mary Corrigan Gorman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1976
$17,716
1977
$24,742
1978
$26,640
The sole issue for decision is whether petitioner's farming activity constituted a trade or business or an "activity not engaged in for profit" within the meaning of section 183(a). [1]
*504 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Baltimore, Md., when he filed his petition herein. Petitioner, a successful businessman, is president and a shareholder of James Keelty and Co., Inc., a residential land development company which builds and owns apartment houses. For 1976, petitioner reported adjusted gross income of $76,503, including, inter alia, $83,795 in wages, $38,457 in dividends (after the $100 exclusion), $16,052 in interest (total -- $138,304), and a farming loss of $55,385. For 1977, petitioner reported adjusted gross income of $109,541, including, inter alia, $89,083 in wages, $60,625 in dividends (after the $100 exclusion), $9,641 in interest (total -- $159,349), and a farming loss of $39,330. For 1978, petitioner reported adjusted gross income of $145,191, including, inter alia, $92,368 in wages, $54,067 in dividends (after the $100 exclusion), $9,875 in interest (total -- $156,310), and a farming loss of $30,795. During 1979 through 1981, petitioner received wages, interest, and dividends in an amount not less than that earned during 1976 through 1978. During 1966 or 1967, petitioner *505 decided to purchase a farm on Maryland's Eastern Shore (the east side of Chesapeake Bay); he then looked at approximately a dozen properties in two counties. However, because petitioner perceived the farms in those counties to be too expensive (approximate cost of between $1,000 and $2,000 per acre), he expanded his search to Dorchester County and purchased the Ross Range Farm in that county on October 1, 1967, for approximately $336,000 (approximately $670 per acre for 500 acres). The farm is located in the "Neck area" of Dorchester County. The Ross Range Farm consists of 205 acres of tillable land, 25 acres of lanes and areas around buildings, 260-plus acres of standing timber, and 5 acres of swampland. Three habitable buildings are on the farm: the main house, the farmer's house, and the brick house. The main house has been leased to tenants since 1967. The farmer's house is occupied by Mr. Franklin Peters, the farmer who has worked the Ross Range Farm since 1949. The brick house is occupied by petitioner when he visits the farm; it is also leased during hunting season (end of October to middle of January) to Lancroft Gunners, Inc. (the gun club), a private club composed *506 of approximately five members, one of whom is petitioner. The rents from the leases ($4,575 in 1976, $4,900 in 1977, and $2,355 in 1978) are treated as farm income. The brick house is a relatively small two-story structure of approximately 2,300 square feet. The house has no air conditioning and sits on approximately two acres of grass. All three houses are near Phillips Creek, which is somewhat less than a quarter of a mile wide and runs along petitioner's property; the brick house is approximately 75 feet from the creek. Each of the houses has a pier nearby. Two of those piers have had to be rebuilt by petitioner since he purchased the property. The creek is not well suited for swimming, as the creek bottom has soft mud, and mosquitos are quite plentiful. Petitioner's farming experience, prior to purchasing Ross Range Farm, was limited to growing up on a farm. Before petitioner began looking for a farm to purchase, he did not make any evaluation of whether he could operate a profitable farm; he simply decided to purchase one. [2] When petitioner began looking in Dorchester County, he did not look at any records of crop yields in the area. Petitioner did know someone *507 who operated a farm near Ross Range Farm, but he did not have access to that farmer's records; however, petitioner did see an informal operating statement for Ross Range Farm for 1966 and 1967. Consequently, when petitioner purchased Ross Range Farm, he had, at best, a very limited understanding of whether he could operate a profitable farm. Since petitioner did not plan to operate the farm himself, it was necessary that a tenant farmer be located. Petitioner inquired of a person in the Neck area as to the competence of Franklin Peters, the farmer working Ross Range Farm under the previous owners. Peters was, according to this person, "known as one of the best farmers, as far as operation, in the area." However, petitioner did not meet Peters prior to purchasing the farm. After petitioner purchased Ross Range Farm, he discussed with Peters and with T. R. O'Farrell, an appraiser, what equipment to purchase for the farm. Petitioner decided not to purchase the equipment already on the farm, because he was advised it was overpriced. instead, he requested bids from farm equipment *508 dealers and purchased equipment from the low bidder. Since 1967, Ross Range Farm has been operated in substantially the same manner. Prior to planting time, petitioner and Peters discuss production questions such as what crops are to be planted in what fields (crop rotation) and make any necessary decisions on what improvements should be made to the farm. [3] Throughout the year, petitioner and Peters are in contact approximately once a week, either by telephone or in person when petitioner visits the farm. Routine decisions, such as how much seed and fertilizer to purchase are made by Peters; he then purchases the goods, and the bills are sent to petitioner's office in Baltimore. All financial decisions relating to the farm are made by petitioner; Peters is "not sophisticated" in financial matters. All farm records are maintained in a professional manner. Ross Range Farm has had a long history of losses since petitioner acquired it. The following chart reflects petitioner's farming operations from 1967 through 1981. Real
estate
taxes
Total
Total
Depreci-
and
Other
Year
income
expenses
ation
interest
expenses
[1] Profit/Loss 1967
$3,000
$9,283
$5,622
0
$3,661
($6,283)
1968
18,923
69,135
21,871
$14,122
33,142
(50,212)
1969
28,504
67,843
19,802
13,519
34,522
(39,339)
1970
32,799
67,422
16,871
13,943
36,608
(34,623)
1971
25,136
60,861
15,627
13,408
31,826
(35,725)
1972
19,348
55,207
13,203
12,649
29,355
(35,859)
1973
46,671
65,827
11,307
11,921
42,599
(19,156)
1974
41,974
63,944
10,812
11,042
42,090
(21,970)
1975
42,203
77,011
13,097
10,362
53,552
(34,808)
1976
33,325
88,770
15,389
9,672
63,709
(55,445)
1977
31,591
70,974
12,120
8,762
50,092
(39,383)
1978
42,317
73,169
10,650
8,923
53,596
(30,852)
1979
50,862
88,427
15,417
9,803
63,207
(37,565)
1980
85,174
83,851
17,121
2,644
64,086
1,323 1981
34,917
104,811
18,837
2,601
83,373
(69,894)
1967-
1975
258,558
536,533
128,212
100,966
307,355
(277,975)
1967-
1978
365,791
769,446
166,371
128,323
474,752
(403,655)
1967-
1981
536,744
1,046,535
217,746
143,371
685,418
(509,791)
*509 The profit for 1980 was due to (1) an increase in the price of corn, (2) storing crops grown in 1979 and selling them in 1980, and (3) not paying for fertilizer purchased in 1980 until 1981. Ross Range Farm, under its prior owners, was operated either as a grain farm (primarily corn and/or wheat) or a grain and cattle farm, and petitioner has continued these activities with the exceptions hereafter noted. From 1967 through 1980, petitioner made additional capital expenditures of $148,000. Petitioner raised cattle for sale on the farm in 1969, 1970, 1971, 1974, and 1975. Petitioner then decided that the effort was not paying off and abandoned cattle production. Petitioner also engaged in "double-cropping," whereby a second crop was planted in a particular field after a first crop was harvested; thus, two crops were at times planted in a particular field during the course of a year. Sorghum (milo) was grown on the farm in 1974 and from 1977 through at least 1981. [4] Petitioner has also *510 grown wheat in several of the years. In 1975, eight acres of timber were harvested from the farm; [5] petitioner received $6,763 for the timber, or approximately $845 per acre. The acreage cleared of timber has since been planted with crops. Similarly, petitioner has increased his tillable land in certain years by leasing farmland (approximately 30 acres) from others. [6] Such leasing has been contingent on the availability of labor to work the fields. Petitioner has also "forward contracted," i.e., stored crops and sold them the following year. Petitioner also makes an effort to keep abreast of farming matters by reading various farming *511 publications, including the "Kiplinger Farm Letter" and the "Farm Journal." In addition, petitioner and Peters consult with various farming experts, including county farming officials. Petitioner, who is a bachelor, visits the farm approximately twice a month, usually on weekends. Approximately half of the time petitioner comes alone; the other half of the time, petitioner brings guests. During duck and goose hunting season, petitioner hunts on the farm with his friends in the gun club. Gun club members, including petitioner, pay a use fee each time they visit the farm for hunting purposes. Petitioner has been a hunter since the mid-1950's. The gun club was formed in 1965; the club members are all old friends. Prior to petitioner's purchase of Ross Range Farm, these hunters paid other farmers for the right to hunt on their farms. The members of this club see each other socially outside of their hunting activities. Peters has nothing to do with the gun club; he does not take care of its boats. Petitioner also has a Sports Fisherman, a personal boat, which he uses during the summer. When petitioner purchased the farm, he did so primarily with the intent of operating a farm; *512 although appreciation in the value of land was not in petitioner's mind when he purchased the farm, it is something that he later took into account. Petitioner believes that the best use for his property is as a farm [7] and that the property has appreciated greatly in value. ULTIMATE FINDING OF FACT Petitioner's farming activity in operating Ross Range Farm was an activity not engaged in for profit during the taxable years at issue. OPINION The sole issue for decision is whether petitioner's farming activity in 1976, 1977, and 1978 constituted, under section 183(a), an "activity not engaged in for profit." [8] Whether an activity is engaged in for profit turns on whether the taxpayer has a bona fide objective of making a profit. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), *513 affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). Petitioner's objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979). Mere statements of intent are not determinative. Engdahl v. Commissioner,supra at 666; Churchman v. Commissioner,68 T.C. 696, 701 (1977). The burden of proof is on the petitioner. Golanty v. Commissioner,supra at 426; Boyer v. Commissioner,69 T.C. 521, 537 (1977). *514 The regulations under section 183 list the following nine relevant factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation. Section 1.183-2, Income Tax Regs.
We see no need to dissect the record herein separately with respect of each of the foregoing factors. Rather, we will deal with the totality of the circumstances revealed by that record in the context of the elements which each party asserts in favor of his position. Petitioner argues that the manner in which he searched for and subsequently operated the farm and the expertise of his advisors, *515 combined with the unexpected hardships that he "had to deal with," establish that he operated the farm with a profit objective. Specifically, petitioner contends that he: searched for a farm with a low enough cost per acre to support a successful farm; employed a knowledgeable and competent farmer; acquired and maintained proper farm equipment; maintained and improved the soil; engaged in proper crop management and rotation; controlled farm costs; tried various types of farming activities; leased additional land for cultivation; harvested timber and converted that land to grain cultivation; read farm journals; caused the farm's records to be maintained in a professional manner; consulted various professionals (including his accountant, government officials, and Peters); actively participated in the farm's management on a year-round basis. Respondent contends, on the other hand, that petitioner purchased a "country estate" which he used for hunting and boating, as a weekend retreat (either alone or with guests), and to shelter his other income. Specifically, respondent argues that, in light of petitioner's substantial outside income, the farm's long history of losses, petitioner's *516 recreational and social use of the property, petitioner's lack of expertise in farming, and petitioner's failure to establish budgets to assist in determining whether a profitable operation could ever be conducted, we should find that petitioner did not operate the farm with a profit objective. We agree with petitioner that the farm was operated in a businesslike manner and that Peters was an excellent farmer. But the hard fact is that, despite this, the farm lost, on the average, over $30,000 per year over a long period of years regardless of what crops were grown or other farming activities, i.e., cattle-raising in the earlier years. Petitioner contends that farm commodity prices have not kept pace with inflation and that he would not have stuck with farming all these years if he did not believe that farm prices would rise to the point where he would produce a profit. [9] By the end of 1975, Ross Range Farm had lost in excess of $275,000 [10] despite the fact that petitioner had made several innovations in farming operations in an attempt to show a profit. Thus, at least by that time, the handwriting was clearly on the wall. Even if crop prices did begin to rise with inflation *517 after 1975, petitioner must have known that his costs would rise as well, see n. 9, supra, and that the pre-1976 pattern of losses would continue. Moreover, the record is devoid of evidence that the farming operations would have produced a profit even if crop prices had kept pace with inflation. In short, we have considerable doubt that petitioner's continued "faith" in the prospect of increased farm prices [11] and the impact thereof on his farming operations was bona fide during the years at issue. [12] Cf. G.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 657 (1968), remanded 406 F.2d 290 (6th Cir. 1969). [13]
*518 Petitioner also contends that harsh weather conditions significantly contributed to the farm's problems. However, other than the devastation caused in 1972 by Hurricane Agnes, petitioner's witnesses discussed adverse weather only in general terms. Moreover, petitioner's 1972 farm loss was only $134 greater than his 1971 farm loss ($35,859 compared to $35,725) [14] and his total farm income for 1972 was only $5,788 less than his total farm income for 1971 ($19,348 compared to $25,136). We therefore find it improbable that occasional unusually harsh weather conditions could have caused the substantial losses petitioner incurred year after year. We deal next with petitioner's contention that, while he may have incurred losses for all but one year from farming, he still had a profit objective because the timber crop was valuable, since it was approaching maturity, and because, over-all, the property was greatly appreciating in value. We think the record herein is totally inadequate to support either contention. [15]
*519 With respect to the timber, aside from the evidence of a small amount of income from the sale of timber in 1975 (and possibly in 1968), see p. 8, supra, and some general testimony of petitioner as to the value of the timber during the years at issue, i.e., over $200,000, based on the price received in 1975, the record is devoid of any proof as to whether the timber was valuable or could have been expected to be valuable or the cost of cutting, removing, and selling the timber. [16] Consequently, we have no basis for determining any potential value of the timber which we could say supported petitioner's contention as to the profit objective. In this connection, we take note of the fact that the record indicates that the price of timber dropped after 1975. Moreover, to the extent that the timber had value, it would be subsumed in the over-all value of the property or, alternatively, that over-all value would have to be correspondingly reduced. It is to petitioner's contention with respect to that over-all value that we now turn our attention. *520 Petitioner contends that the best use of the property is as a working farm and that in 1979 the farm was worth approximately $1,000,000 (or $2,000 per acre). At trial, petitioner described two farms that had been sold in the Neck area in support of his estimation. A 75-acre farm with one house and some equipment buildings on it sold in 1978 for $170,000 (or $2,266 per acre) and an 88-acre property with a very large, luxurious house that petitioner said was "certainly worth $300,000" sold in 1982 for $585,000. In Dorchester County, the price per acre of farmland varies between farms of less than or greater than 100 acres. Ross Range Farm, however, is a 500-acre farm, while the two farms petitioner described are both less than 100 acres. No other evidence was presented regarding the comparability of these farms with Ross Range Farm. Consequently, we cannot determine even the approximate value of Ross Range Farm from the properties petitioner described. Petitioner also contends that the appreciation is proved by the increase in the assessed value of the property from $60,545 in June 1969 to $327,500 in June 1983. We disagree. While the assessed value of the property did increase *521 dramatically, the real estate taxes on Ross Range Farm only increased from $2,233 in 1968 to $2,601 in 1981. The increased assessment is of little or no value in determining appreciation without any evidence as to the basis upon which the assessed values were fixed, and the record is silent on this score. At best, the record indicates that petitioner had some "vague and unauthenticated notion" that the property was appreciating or would appreciate. LaMusga v. Commissioner,T.C. Memo. 1982-742. But such a notion, without any probative foundation, is not enough to support a profit objective and, in particular, a contention that the appreciation could be anticipated to be sufficient to recoup petitioner's farming losses. [17] Moreover, we cannot ignore the fact that the presence of a loss farming operation would have a substantial impact on the value of the property, particularly in light of petitioner's position that farming represented the property's best use. [18]
Finally, we confront petitioner's assertions, both during his testimony *522 and on brief, that he operated Ross Range Farm with a profit objective. Such assertions are not gospel truth, Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Churchman v. Commissioner,68 T.C. 696, 701 (1977), and, considering all the facts and circumstances of this case, are not persuasive. While it is clear that the combination of significant outside income and continuous losses is not sufficient (which is the case herein), in and of itself, to establish lack of profit objective, nevertheless, these factors can be taken into account.Section 1.183-2(b)(6) and (8), Income Tax Regs.; Jasionowski v. Commissioner,66 T.C. 312, 322 (1976). This Court has stated that a record of substantial losses is an "important factor," Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Boyer v. Commissioner,69 T.C. 521, 538 (1977). We recognize that many cases exist in which wealthy taxpayers have been held to operate farms as trades or businesses in the face of continuous losses; however, not only must each case be decided on its own facts *523 and circumstances, but many of these cases involve tax years prior to the operation of section 183. One of the abuses against which section 183 was enacted was the use of farms by wealthy persons to produce "tax losses." As Senator Gore noted-- Wealthy individuals have invested in certain aspects of farm operations solely to obtain "tax losses" -- largely bookkeeping losses -- for use to reduce their tax on other income. * * * * * * One of the remarkable aspects of the problem is pointed up by the fact that persons with large nonfarm income have a remarkable propensity to lose money in the farm business." [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 635 (Individual Views of Senator Albert Gore).] See also H. Rept. 91-413 (1969), 1969-3 C.B. 200 at 244-245; S. Rept. 91-552 (1969), 1969-3 C.B. 423 at 489-490. See also Fisher v. Commissioner,T.C. Memo. 1980-183 (section 183 was added to the Code "to prevent high income taxpayers from profiting through the harvesting of their taxes rather than their farms"). Petitioner points out that in 1976-1978 he had a cash loss of $18,423 even after his claimed tax benefits (net *524 cash outlay less tax savings if farming losses allowed). [19] However, on the record herein, we believe that whether the farm made or lost money was of little consequence to petitioner. As long as the losses were not unbearable (and petitioner apparently did not consider losses of approximately $34,000 per year unbearable), petitioner saw little reason to abandon his farming activities. [20] His out-of-pocket losses were at least offset to a substantial degree by the claimed tax benefits. *525 Petitioner exhibited a certain nonchalance in determining which farm to purchase and in not undertaking to determine whether farms in the area were being operated profitably. [21] See pp. 3-5, supra. Similarly, petitioner presented no evidence that he considered farming to be a sound investment. As a man of great means (petitioner's dividend and interest income in 1976-1978 averaged in excess of $60,000 per year), petitioner clearly knew how to invest his money. Moreover, petitioner did not even speak with Peters before he purchased the farm. Petitioner's nonchalance carried over to his willingness to accept losses year after year without selling the farm or discontinuing the farming activities. *526 In sum, we hold, on the basis of the entire record herein, that petitioner has failed to carry his burden of proof that he incurred the farm losses at issue herein because he had a bona fide objective of making a profit from farming operations. We believe that Ross Range Farm was, in effect, petitioner's weekend retreat. [22] When petitioner visited the farm, he rarely did any farming work; instead he apparently relaxed, boated in the summer, and hunted ducks in the winter. We are unpersuaded that petitioner, whom we found to be a bright and knowledgeable person, could have actually believed in good faith -- at least during the years at issue -- that the operations of Ross Range Farm would or could be profitable. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. Although petitioner "knew" that farming was "risky," he "assumed" he would make money from it.↩
3. For example, petitioner has had several tests done on his soil and has taken steps, in consultation with Peters, to improve the soil's quality.↩
1. The difference between the loss figures for 1976, 1977, and 1978 shown below and the amounts shown on the tax returns is due to Federal gasoline tax credits which were not disallowed.↩
4. Due to the high salt content in the farm's soil, petitioner determined that sorghum would do quite well. However, the market for sorghum has apparently not been what petitioner had hoped. ↩
5. According to petitioner's testimony, the timber on the farm had been harvested in the early 1950's, and Exhibit 5-E indicates that some $2,525 was realized from the sale of timber in 1968. This type of timber (loblolly pine) takes approximately 30 years to mature. ↩
6. Petitioner has not leased any part of the Ross Range Farm to other farmers.↩
7. A real estate appraiser testified that the best use of waterfront property in the Neck area was residential. In light of our conclusions in this case, we need not determine the property's best use.↩
8. Section 183(a) provides that "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."↩
9. Petitioner testified that his business experience indicated that the price of a product generally rises in conformity with the costs of the raw materials and the labor that goes into it. ↩
10. For petitioner to establish a profit objective, his goal would have to be "not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening [formative] years." See Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252↩ (2d Cir. 1967). 11. Indeed, petitioner candidly admitted that "Unfortunately, the farmer doesn't control the price of his end product." ↩
12. In the context of the totality of the record herein, we do not consider it significant that Ross Range Farm reported a $1,323 profit in 1980. See also our findings of fact, p. 7, supra,↩ where we list several factors which underlay this isolated, small profit. 13. See also Ellis v. Commissioner,T.C. Memo. 1984-50; Estate of Power v. Commissioner,T.C. Memo. 1983-552, on appeal (1st Cir., Dec. 5, 1983); Faulconer v. Commissioner,T.C. Memo. 1983-165↩, on appeal (4th Cir. Oct. 11, 1983) ("The farming activity * * * has certainly advanced beyond the initial stages in which losses might not be inconsistent with a profit motive").
14. In 1973, petitioner's farm loss dropped to the 1968-1978 low of $19,156.↩
15. In view of our conclusion, we find it unnecessary to deal with the question whether the holding of the timber and the holding of the property for appreciation should be considered as activities separate from the farming activities or as elements of a single activity, namely, farming. In this connection, we note that petitioner has treated his holding for these purposes as part and parcel of his farming operations. See section 1.183-1(d)(1), Income Tax Regs. ("Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities"). We also note that, while respondent's regulations deal specifically with the separate-versus-single-activity issue where land is "purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming" and, in this context, require the farming operation to stand on its own feet (section 1.183-1(d)(1), Income Tax Regs.), the regulations do not deal specifically with the situation where the appreciation element is involved in determining the profit objective for a farming operation. Where the decided cases have suggested that the single-activity concept applies in the latter situation, they have taken the anticipated profit from the appreciation of the property into account only as one of several elements which pointed in the direction of the requisite profit objective. See, e.g., Engdahl v. Commissioner,72 T.C. 659 (1979), and particularly at 668 n. 4; Fields v. Commissioner,T.C. Memo. 1981-550; Sparre v. Commissioner,T.C. Memo. 1980-45. Whether such anticipated profit can, in and of itself, determine that a farming operation has a profit objective remains doubtful. Cf. Jasionowski v. Commissioner,66 T.C. 312, 323 (1976) ("[I]f the anticipation of eventually selling the house at a profit were in itself sufficient to establish that the property was held with a profit-making intent, rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim").See LaMusga v. Commissioner,T.C. Memo. 1982-742↩.
16. In the case of the 1975 sale, the purchaser was responsible for cutting and removing the timber, but we have no way of determining from the record that this procedure would have uniformly been applicable.↩
17. See LaMusga v. Commissioner,supra.↩
18. See LaMusga v. Commissioner,supra.↩
19. The following chart depicts petitioner's expenses, receipts, and potential tax liability for 1976, 1977, and 1978: ↩
1976
1977
1978
Total
Total expenses
$88,770  $70,974  $73,169
$232,913 Minus depreciation
15,389  12,120  10,650
38,159 Total cash expenses
$73,381  $58,854  $62,519
$194,754 Less total cash
receipts
33,325  31,591  42,317
107,233 Net cash outflow
$40,056  $27,263  $20,202
$ 87,521 Potential tax
liability when
farming losses
disallowed
17,716  24,742  26,640
69,098 Net cash savings
realized from
operation of
Ross Range Farm
as a farm
($22,340)
($2,521)
$ 6,438
($18,423)
20. Petitioner testified that "considering the operation and the things we've had to deal with," he did not consider $108,961 (the amount by which cash expenditures incurred between 1967 and 1978 that would be deductible only as trade or business expenses exceeded total income) to be "an inordinate amount." Petitioner's contention that he would not have lost all this money just to hunt ducks, expecially since, according to petitioner, the number of ducks was declining each year, begs the question. The abundance or scarcity of ducks during 1976-1978 is not the issue; the issue is, why did petitioner operate the farm?↩
21. Petitioner contends that he purchased a farm with a lower cost per acre because he did not think he could establish a profitable farm on more expensive farmland. No evidence was presented as to why petitioner believed cheaper land would be the determining factor in whether a farm would be profitable, especially since most of the costs incurred by petitioner on Ross Range Farm have no apparent connection whatsoever with the cost of the farmland. We believe that petitioner's real reason for purchasing a farm with a cheaper cost per acre was to allow himself to acquire a larger retreat at a more acceptable cost.↩
22. Considering petitioner's recreational uses of the property (hunting and boating), the lack of a swimming pool, tennis courts, and/or a "luxurious home" on the property is of little consequence.↩