# United States Court of Appeals
## For the First Circuit

_____

No. 99-2180

LOUIS A. FILIOS;
ESTATE OF EMMA L. FILIOS, DECEASED,

Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellee.

_____

ON APPEAL FROM A DECISION OF THE
UNITED STATES TAX COURT

_____

Before

Torruella, Chief Judge,

Stahl and Lipez, Circuit Judges.

_____

Louis F. Brush for appellants.
Curtis C. Pett, Attorney, Tax Division, Department of Justice,
with whom Paula M. Junghans, Acting Assistant Attorney General, and Ann
B. Durney, Attorney, Tax Division, Department of Justice, were on
brief, for appellee.

_____

August 18, 2000
_____

**TORRUELLA, <u>Chief Judge</u>.** This appeal arises from a decision of the United States Tax Court finding petitioners Louis A. Filios and Emma L. Filios liable for deficiencies in their 1992 and 1993 income tax payments. The question presented to the Tax Court was whether petitioner Louis Filios was pursuing horse racing and breeding for the primary purpose of earning a profit during the years in question. The Tax Court held that the requisite profit motive was lacking. <u>See generally</u> <u>Filios</u> v. <u>Commissioner</u>, No. 15719-96, 1999 WL 163035 (T.C. 1999).

For the reasons stated below, **we affirm** the decision of the Tax Court.

BACKGROUND

The Tax Court meticulously addressed the facts in this case. <u>See</u> <u>Filios</u>, 1999 WL 163035, at *1-*5. That discussion, based predominately on the parties' stipulation of facts, is amply supported by the record. Accordingly, we largely reiterate it here.

## I. <u>Petitioners</u>

Petitioners are Louis A. Filios and Emma L. Filios. Petitioners were married and lived in West Springfield, Massachusetts, when they filed the petition in this case. On March 12, 1997, Emma L. Filios died. Petitioner Louis A. Filios is executor of the Estate of Emma L. Filios. (Hereafter, references to petitioner are to Louis A. Filios.)

## II. __Westfield Gage Co.__

In 1955, petitioner founded Westfield Gage Co., a corporation which manufactures precision parts for airplanes and jet engines. Since its inception, petitioner has been the company's president and sole shareholder. Over the years, he generally worked seven or eight hours per day at Westfield Gage.

Petitioner did not prepare a written business plan, conduct economic or business studies, or hire consultants for Westfield Gage. However, when the corporation was having financial difficulties, Westfield Gage's treasurer, Eugene Kida, prepared budgets. In addition, petitioner testified that, if Westfield Gage was losing money, he would have sought advice on how to turn the business around. He explained that Westfield Gage "had to make money . . . so I could pay for my horses."

From 1979 to 1993, Westfield Gage had a total taxable income of $8,842,137. It had gross receipts of $10,523,177 in 1992 and $9,707,359 in 1993; net profits for the same years were $972,058 and $102,470, respectively.

Mary Kuta was Westfield Gage's bookkeeper from 1955 to 1992. She kept Westfield Gage's books and records, filed its quarterly tax returns, and prepared its payroll. Eugene Kida, a certified public accountant with a master's degree in business administration, worked for Westfield Gage from 1984 to 1995 as company treasurer. Kida also

prepared petitioners' personal income tax returns, which required that he examine petitioner's horse racing and breeding records.

## III. Petitioner's Horse Racing and Breeding Activity

Petitioner bought his first thoroughbred in 1955. In general, he spent between ten and twenty hours per week engaged in horse racing and breeding activities. Petitioner never trained or stabled any of his horses at or near his home in West Springfield, he did not own a farm or any equipment used to train his horses, and neither he nor members of his family rode the horses. On average, he retained his horses three to four years, giving him adequate time to assess their racing potential. Petitioner's best horses generally ran in races paying purses from $12,000 to $30,000.

### A. Horse Publications

Dating back to 1959, and continuing through the years in question, petitioner subscribed to various industry publications, including The Blood Horse and Thoroughbred Record. In addition to these periodicals, he read numerous horse racing and breeding books during this time. He also studied The Blood Horse Stallion Register, which was published annually. It contains information about thoroughbred stallions, such as pedigrees, racing records, and racing earnings. Petitioner used The Blood Horse Stallion Register to decide which horses to breed and which to buy.

### B. Vitamin and Mineral Supplements

-4-

Initially, petitioner's thoroughbreds were not high-quality horses. He believed, however, that giving the horses vitamin and mineral supplements would increase their value. To this end, petitioner, by his own account, was one of the pioneers in using nutrition and vitamin supplements as part of the diet for his stable of horses. Petitioner personally decided which vitamins and minerals to use, mixed them, and sent them to the trainers to give to the horses. Petitioner did not, however, keep records showing which vitamins or minerals he gave to each of his horses or the nutrition and diet of each horse.

## C. **Breeding and Training**

As indicated, petitioner spent ten to twenty hours per week on his horse racing and breeding activity. He attended horse auctions to buy and sell horses. He talked to breeders. He visited the farms in Kentucky and tracks in New Jersey where he stabled his horses. He reviewed mail, and he prepared the vitamin and mineral supplements for the horses. In addition, petitioner signed all checks relating to the activity and reviewed all of the track purse and race results.

Petitioner went to England, France, and Germany in 1977 on a tour of breeding farms, race tracks, and training centers. Petitioner also toured similar facilities in Ireland on a date not specified in the record. Further, he took courses about horses at

Cornell University in 1985, 1986, and 1990, and stud manager's courses in 1964 and 1970.

### D. Records and Reports

Westfield Gage (not petitioner) paid Mary Kuta to keep the records for petitioner's horse racing and breeding activity from 1955 through 1993. The record indicates that prior to 1992, Kuta spent ten to fifteen percent of her time working on the horse racing and breeding activity, and part of this time was spent gathering information for petitioner's tax returns. In 1992 and 1993, Kuta worked only on the horse activity.

Kuta decided which records of the horse racing and breeding activity to keep and how to keep them. Although petitioner conceded that he did not know exactly what types of records Kuta maintained, Harry Landry, a commercial race-horse breeder who was hired by petitioner as an expert witness, opined that petitioner's records were "excellent and meticulous" and were "very much in line with industry practice."

Petitioner had a separate bank account for his horse racing and breeding pursuits from 1963 through the years at issue. Kuta maintained the expense records for these accounts. She kept copies of canceled checks, check registers, invoices, and other correspondence. Further, Kuta kept copies of invoices from petitioner's trainers and from farms where his horses were stabled. She also kept statements

from racetracks at which petitioner's horses raced showing the race dates, his horses' standing in those races, and the total amounts that his horses won. Although Kuta did not regularly prepare records showing how much each horse earned, in a few of the years before the years in issue, she prepared a summary at the end of the year showing the earnings of each horse.

In addition, at the end of each year Kuta prepared summaries from race track statements to ensure that the Forms 1099 issued by the racetracks were accurate. She also used race track statements to ensure that the various expenses charged to petitioner by the tracks, such as jockey fees, were correct.

From 1959 to 1989, Kuta prepared disbursement spreadsheets which showed expenses of the horse racing and breeding activity by category. The spreadsheets were usually prepared at the end of the year, from information in the check register, and were used both to monitor expenses and for tax return preparation. In some years the spreadsheets listed disbursements chronologically; in other years, the spreadsheets listed disbursements by payee. The spreadsheets did not, however, segregate expenses by horse.

Kuta prepared index cards on most of petitioner's horses from around 1956 through the time of the trial which showed the name of the horse, its year of birth, its sire and dam, when petitioner acquired it and from whom, the purchase price, when petitioner disposed of the

horse, and the name of the party acquiring the horse. Some index cards showed whether the horse had a jockey certificate number, which the horse needed in order to be eligible to race. Kuta prepared the index cards in part to show Kida which horses were depreciable and which were home-bred.

From 1974 to 1996 (excluding 1994), Kuta prepared yearly breeding schedules for petitioner's mares. These schedules generally included the name of each mare available for breeding, the name of the stallion to which it was being bred, and the breeding fee. If the mare was still carrying a foal from the prior year's breeding, the schedule gave the name of the stallion. Kuta prepared the breeding schedules to ensure that she had properly registered the foals and paid breeding fees and to determine whether a refund was due.

The record indicates that petitioner never conducted written business studies for his horse racing and breeding activity. Similarly, he never prepared a written business plan or budget for the activity.

### E. Petitioner's Reliance on Others

Petitioner never hired business advisers or consulted with experts on the economic aspects of a horse racing and breeding operation. Petitioner did, however, use professional trainers, veterinarians, horse farms, breeders, auctioneers, and jockeys.

Petitioner hired four to nine trainers each year from 1985 to 1993. Petitioner frequently called the trainers and talked to them about which horses to race and which horses to train. He asked their opinion, and he often followed their advice. Petitioner did not, however, keep records regarding the performance or race results of the trainers. Further, petitioner did not require his horse trainers to submit plans of operations or any other written reports. The only written reports that the trainers submitted to petitioner were informal notes they occasionally made on their invoices. For example, trainer George Handy wrote on his May 1992 invoice that "[c]olts are progressing ok., Morgan Rd seems to learn much faster than Go Go Tiger, both are galloping 1½ each day now."

Regarding the sale and purchase of horses, petitioner relied on veterinarians, breeders, professional trainers, and auctioneers. It is not clear whether petitioner relied on a trainer or breeder when he decided which horses to breed; petitioner states that he did, but the Tax Court seemed to indicate otherwise. The record does show that petitioner personally arranged for his mares to be bred, and he personally reviewed and executed the stallion contracts.

F. **Petitioner's Breeding and Herd Management Program**

Between 1955 and 1996, petitioner removed 124 horses from his herd by selling or giving them away. Despite this, petitioner

increased the size of his herd over time, which grew to a high of eighty-four horses in 1990.

In the mid-1970s, in an effort to improve the quality of his horses, petitioner began to send his mares to be bred by Kentucky stallions which had excellent pedigrees but unproven racing records. Later, in 1990 or 1993, petitioner changed his breeding strategy again and began to use stallions with proven pedigrees and race performance.

### G. Cost Controls

When asked about cost control measures, petitioner stated, "I didn't change operating methods to decrease expenses, I changed operating methods to make things better." Petitioner further testified that he did not care how much he paid for a breeding fee, although he did indicate that "[w]e'd try to get the best for the money." Similarly, petitioner stated that his horses were easy to sell because he kept lowering the price until they sold, or he would just give them away. Finally, when asked why he continued to sink money into horse racing and breeding, petitioner simply stated "I was determined to get the best horse, and I practically did it, but I'm running out of it, time."

## IV. Petitioners' Income Tax Returns

Petitioners reported the horse racing and breeding activity on their joint federal income tax returns each year from 1957 through the years in issue. The following chart shows the amounts of gross

receipts, expenses, and losses that petitioners reported on Schedules

C from 1957 to 1993:

| Year | Gross receipts | Expenses | Losses |
|------|---------------|----------|--------|
| 1957 | None | $12,919.36 | $12,919.36 |
| 1958 | 5,575.00 | 25,268.34 | 19,693.34 |
| 1959 | 7,729.00 | 45,809.97 | 38,080.97 |
| 1960 | 4,805.00 | 53,429.56 | 48,624.56 |
| 1961 | 19,345.00 | 56,677.46 | 37,332.46 |
| 1962 | 4,280.00 | 48,705.54 | 44,425.54 |
| 1963 | 5,630.00 | 48,674.38 | 43,044.38 |
| 1964 | 25,666.00 | 56,735.85 | 31,069.85 |
| 1965 | 28,506.00 | 50,189.20 | 21,683.20 |
| 1966 | 34,717.00 | 58,908.42 | 24,191.42 |
| 1967 | 33,895.50 | 71,575.82 | 37,680.32 |
| 1968 | 43,903.70 | 79,234.31 | 35,330.61 |
| 1969 | 32,353.00 | 74,010.00 | 41,657.00 |
| 1970 | 35,722.00 | 69,917.00 | 34,195.00 |
| 1971 | 23,499.00 | 55,394.00 | 31,895.00 |
| 1972 | 19,637.00 | 51,524.00 | 31,887.00 |
| 1973 | 12,544.40 | 60,650.27 | 48,105.87 |
| 1974 | 21,347.00 | 77,845.15 | 56,498.15 |
| 1975 | 27,320.64 | 100,913.06 | 73,592.42 |
| 1976 | 44,028.00 | 118,674.00 | 74,646.00 |
| 1977 | 21,140.00 | 102,571.00 | 81,431.00 |
| 1978 | 58,662.00 | 132,278.00 | 73,616.00 |
| 1979 | 89,971.00 | 161,913.00 | 71,942.00 |
| 1980 | 60,651.00 | 180,943.00 | 120,292.00 |
| 1981 | 127,225.00 | 207,589.00 | 80,364.00 |
| 1982 | 78,804.00 | 213,686.00 | 134,882.00 |
| 1983 | 111,853.00 | 284,373.00 | 172,520.00 |
| 1984 | 106,814.00 | 354,937.00 | 248,123.00 |
| 1985 | 124,671.00 | 471,417.00 | 346,746.00 |
| 1986 | 111,295.00 | 545,642.00 | 434,347.00 |
| 1987 | 178,776.00 | 615,973.00 | 437,197.00 |
| 1988 | 136,327.00 | 672,014.00 | 535,687.00 |
| 1989 | 204,403.00 | 757,630.00 | 553,227.00 |
| 1990 | 116,400.00 | 774,735.00 | 658,335.00 |
| 1991 | 145,405.00 | 814,477.00 | 669,072.00 |
| 1992 | 136,463.00 | 814,103.00 | 677,640.00 |
| 1993 | 234,588.00 | 807,259.00 | 572,671.00 |
| Total | 2,473,951.24 | 9,128,595.69 | 6,654,644.45 |

## V. Prior Examinations

The Commissioner audited petitioners' 1977 federal income tax return in 1980 and their 1984 return in 1987. The Commissioner made no adjustments to those returns.

## VI. The Proceedings Before the Tax Court

On April 24, 1996, the Commissioner sent a notice of deficiency to petitioners stating that their federal income tax returns were deficient in the amounts of $194,121 and $133,807 for 1992 and 1993, respectively. The notice further stated that petitioners were liable for accuracy-related penalties pursuant to 26 U.S.C. § 6662 in the amount of $38,824 for 1992 and $26,761 for 1993. On July 22, 1996, petitioners filed a timely petition in the United States Tax Court for a redetermination of the deficiencies and penalties.

Following a trial, the Tax Court entered its decision on July 7, 1999. The Tax Court held that petitioners were liable for the deficiencies as assessed by the Commissioner, but that they were not liable for the accuracy-related penalties for negligence. See generally Filios, 1999 WL 163035. This appeal followed.[1]

### DISCUSSION

The sole issue before this Court is whether the Tax Court erred in ruling that petitioner's horse racing and breeding activity

---

[1] The Commissioner does not appeal the Tax Court's finding that petitioners are not liable for accuracy-related penalties.

-12-

was "not engaged in for a profit." See Filios, 1999 WL 163035, at *8. This is a finding of fact, which we will overturn only if it is clearly erroneous. See Estate of Power v. Commissioner, 736 F.2d 826, 831 (1st Cir. 1984).

The law in this case is not in dispute. Pursuant to Internal Revenue Code section 183, if an "activity is not engaged in for profit, no deduction attributable to such activity shall be allowed," 26 U.S.C. § 183(a), except "to the extent [of] the gross income derived from such activity," id. § 183(b)(2). Treasury Regulation § 1.183-2(b) sets forth nine factors for courts to consider in determining whether a taxpayer had the requisite profit motive. These factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See Treas. Reg. § 1.183-(2)(b).

These factors are nonexclusive, see, e.g., Estate of Baron v. Commissioner, 798 F.2d 65, 72 (2d Cir. 1986), and their application depends on the facts presented by the individual case, see Treas. Reg.

-13-

§ 1.183-2(b). In addition, no one factor controls; to the contrary, "all facts and circumstances with respect to the activity are to be taken into account." Id. Finally, it is the taxpayer's burden to establish that she pursued her activity for the primary purpose of making a profit. See, e.g., Westbrook v. Commissioner, 68 F.3d 868, 877 (5th Cir. 1995); Faulconer v. Commissioner, 748 F.2d 890, 893 (4th Cir. 1984); Estate of Power, 736 F.2d at 828.

In this case, the Tax Court carefully analyzed each of the factors set forth in Treasury Regulation § 1.183-2(b). See Filios, 1999 WL 163035, at *5-*8. The court concluded that most of the factors strongly indicated that petitioner was pursuing horse racing and breeding as a hobby, and none of the factors indicated that he was pursuing the activity for the primary purpose of making a profit. See id.

Specifically, the Tax Court determined that (1) petitioner did not use financial projections, accounting records, or budgets to control expenses, and he never made any significant changes in the way he operated the activity despite recurrent losses; (2) petitioner and his advisors had expertise in the mechanics of horse racing, but not in the economic aspects of this activity; (3) petitioner devoted time to horse racing and breeding, but he failed to demonstrate that it was enough time to generate a profit; (4) petitioner failed to prove that the value of his horses might increase enough to offset the losses he

-14-

had incurred; (5) petitioner's financial success with Westfield Gage was not relevant because it was not indicative of petitioner's ability to run a profitable horse-racing business; (6) petitioner incurred enormous losses totaling more than $6 million over thirty-seven years; (7) petitioner's horse racing and breeding activity never generated a profit; (8) petitioner was using his substantial income from Westfield Gage to finance his horse-racing activity; and, finally, (9) while petitioner did not ride the horses, he obviously enjoyed owning the horses or he would have abandoned the activity long ago in the face of enormous and continuous losses.  See id.

Having carefully reviewed the record, we cannot say that the Tax Court's findings are clearly erroneous.  To the contrary, the court's findings are amply supported by the record and invariably lead to the conclusion that petitioner's horse racing and breeding activity was not engaged in for profit.  Under the circumstances presented by this case, we see little point in reviewing each of the factors listed in Treasury Regulation § 1.183-2(b).  Instead, we will briefly examine only the factors which we believe are truly at issue.

We begin with factor six -- the taxpayer's history of income or losses with respect to the activity -- because we believe that in this particular case, it is arguably the most telling.  See Treas. Reg. § 1.183-2(b)(6).  The Tax Court determined that the sheer magnitude of petitioner's losses, the consistency with which they were incurred, and

-15-

their steady and dramatic increase over an extended period of time provided compelling evidence that petitioner was not engaged in horse racing and breeding for the primary purpose of earning a profit. We agree.

As the Tax Court correctly observed, petitioner never even came close to realizing a profit during the thirty-seven years that he pursued horse racing and breeding, and his total losses for that period exceeded $6 million. Petitioner's contention that this is an "isolated, non-recurring, marginally relevant fact[]" is disingenuous and contrary to law. See Hendricks v. Commissioner, 32 F.3d 94, 99 (4th Cir. 1994) ("[A] record of continued losses over an extended period of time is plainly relevant in discerning a taxpayer's true motivation."). Further, the cases cited by petitioner are factually inapposite. For example, in Metcalf v. Commissioner, 22 T.C.M. (CCH) 1402 (1963), the taxpayer abandoned his cattle farm after twenty-four years of losses. Although the farm was continued after the normal fifteen-year start-up phase of a cattle-breeding operation, the taxpayer was constantly changing the way in which he did business in an effort to increase income and cut the costs of operation. See id. at 1410-11. When this ultimately proved unsuccessful, the taxpayer abandoned the activity. See id. Here, petitioner has not abandoned his horse racing and breeding activity after thirty-seven years of enormous, uninterrupted, and ever-increasing losses. Consequently, we

-16-

believe it is beyond reasonable dispute that factor six -- petitioner's history of losses with regard to his horse racing and breeding activity -- clearly supports the Tax Court's ruling that the requisite profit motive was lacking.

Likewise, we find factor four, the likelihood of asset appreciation, and factor seven, the amount of occasional profits, equally persuasive. Treasury Regulation § 1.183-2(b)(4) provides that the term "profit" encompasses appreciation in the value of the assets used in the activity. Treasury Regulation § 1.183-2(b)(7), in turn, provides:

> An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

Petitioner concedes that there are no occasional profits in this case. He asserts, however, that his profit motive may be inferred from the speculative nature of the horse business. He notes in this regard that highly successful racehorses not only win large purses but also dramatically increase in value due to their potential to earn

-17-

lucrative stud fees.  The Tax Court carefully considered this argument, citing the testimony of petitioner's expert, which indicates that three to five percent of those in the horse racing and breeding business make about $775 million a year.  See Filios, 1999 WL 163035, at *7.  The court determined, however, that this testimony alone was not conclusive, "absent evidence showing what other horse operations did to become profitable."  Id.  We see no error in this determination.

On this point, we believe that Hendricks v. Commissioner is instructive.  In Hendricks, the court stated:

> [T]he mere expectation that land values may appreciate is not sufficient, in itself, to demonstrate that an activity was engaged in for profit.  Thus, while Hendricks indicated that he generally expected his land to appreciate in value, "such a notion, without any probative foundation, is not enough to support a profit motive and, in particular, a contention that the appreciation could be anticipated to be sufficient to recoup petitioner's farming losses."

32 F.3d at 100 (quoting Keelty v. Commissioner, 47 T.C.M. 1455 (1984)).  Here, petitioner's belief that one or more of his horses might achieve great success was at best a "mere expectation" utterly lacking in "any probative foundation."  Id.  As we have indicated, petitioner made no attempt to show that his horse racing and breeding activity was similar to horse operations that generate substantial profits.  Accordingly, we conclude that petitioner has failed to carry his burden of proving that he had a bona fide expectation of either (1) asset appreciation or (2)

-18-

a small chance to make profits sufficient to offset the enormous losses he had accumulated. Therefore, the Tax Court correctly concluded that neither factor four nor factor seven favors petitioner.

We turn next to the first factor -- the manner in which the activity was conducted. Treasury Regulation § 1.183-2(b)(1) states "[t]he fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit." Pursuant to this provision, courts should also consider (1) whether "an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable," -- which we have already indicated numerous times petitioner failed to do -- and (2) if the taxpayer has changed operating methods to improve profitability. Id.

The Tax Court found that petitioner's recordkeeping failed to indicate a profit motive. See Filios, 1999 WL 163035, at *5. The court reasoned that "[p]etitioner did not have budgets, income statements, balance sheets, income projections, or financial statements for the activity other than those compiled annually by petitioners' accountant to prepare their annual Federal tax returns." Id. Once again, we see no basis for saying that the Tax Court clearly erred.

In general, records that indicate a profit motive are ones that can be used for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of a business on an

-19-

ongoing basis. See, e.g., Westbrook, 68 F.3d at 878 (activity not carried on in a businesslike manner where cost estimates, financial projections, and estimates on the return on capital invested were lacking); Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987) ("[B]ecause the taxpayers had no system to monitor expenses or losses, the petitioners could not make informed business decisions."). As the Tax Court correctly determined, these types of records are totally lacking in this case.

Further evaluating factor one -- the manner in which the activity was conducted -- the Tax Court also concluded that "[p]etitioner's method of operations generally continued unchanged for more than 30 years." Filios, 1999 WL 163035, at *6. The court acknowledged, however, that between 1955 and 1993, petitioner increased the size of his herd and changed his breeding practices twice. We do not necessarily agree with the Tax Court that these changes are de minimis. Nevertheless, we need not consider this point further. Our conclusion regarding petitioner's records, in addition to petitioner's failure to introduce any evidence favorably comparing his activity to a profitable horse racing and breeding operation, leads us to conclude that the weight of the evidence supports the Tax Court's ruling that factor one favors the Commissioner.

Finally, we turn to factor two – the expertise of the taxpayer or his advisors. Treasury Regulation § 1.183-2(b)(2) states

that "[p]reparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices." The Tax Court found that, although petitioner read horse publications, attended horse breeding seminars, and used professional trainers, veterinarians, horse farms, breeders, auctioneers, and jockeys, he did not prove that he possessed the requisite expertise regarding the business end of the activity, or that he relied on the advice of others who possessed that type of expertise. See Filios, 1999 WL 163035, at *6. This determination is amply supported by both the record and the law. See, e.g., Westbrook, 68 F.3d at 878 ("Although the [taxpayers] studied and consulted experts regarding the technical and scientific aspects of horse and cattle raising, they did not seek expert advice regarding the economic or business aspects of these activities."); Burger, 809 F.2d at 359 ("The taxpayers' failure to consult economic experts or develop an economic expertise themselves is another fact that indicates a lack of a profit motive in this case."). Consequently, the Tax Court correctly found that factor two does not favor petitioner.

Given the record in this case, we believe that any further analysis is unnecessary. In our view, the Tax Court reasonably determined that of the nine relevant factors, seven weighed against

petitioner, two were neutral, and none weighed in favor of petitioner. <u>See</u> Treas. Reg. § 1.183-2(b). It would be improper for us to re-weigh the evidence, <u>see</u> <u>Estate of Power</u>, 736 F.2d at 831, and we simply cannot say that the Tax Court's findings are clearly erroneous. Accordingly, we affirm the Tax Court's ruling that petitioner's horse racing and breeding activity was "not engaged in for a profit." <u>See</u> <u>Filios</u>, 1999 WL 163035, at *8.

### CONCLUSION

For the reasons stated above, **we affirm** the decision of the Tax Court.