T.C. Memo. 2013-55

UNITED STATES TAX COURT

WILLIAM T. ROMANOWSKI AND JULIE I. ROMANOWSKI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15562-10.                    Filed February 20, 2013.

<u>Emily J. Kingston</u> and <u>Steven M. Katz</u>, for petitioners.

<u>Kaelyn J. Romey</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal

income tax of $1,305,230,[1] $830,302, $649,676, $808,297, $262,418, $742,051,

and $154,762 for tax years 1998, 1999, 2000, 2001, 2002, 2003, and 2004,

---

[1]All dollar amounts are rounded to the nearest dollar.

[*2] respectively, as a result of disallowed deductions for expenses petitioners incurred in a horse-breeding operation during 2003 and 2004, and disallowed net operating losses (NOLs) carried back to years 1998, 1999, 2000, 2001, and 2002. Respondent also determined accuracy-related penalties under section 6662(a)[2] of $261,046, $166,060, $129,935, $161,659, $52,484, $148,410, and $30,952 for 1998, 1999, 2000, 2001, 2002, 2003, and 2004, respectively. The issues for decision are:

(1) whether petitioners are entitled to deductions for various horse-breeding expenses under either sections 162 or 212. We hold they are not; and

(2) whether petitioners are liable for the accuracy-related penalties under section 6662. We hold they are not.

FINDINGS OF FACT

At the time the petition was filed, petitioners resided in California. Petitioners were married during all relevant years.

1. <u>Background and Introduction to the ClassicStar Program</u>

Mr. Romanowski graduated from Boston College in 1988 with a degree in general management and an emphasis in marketing. After graduating from college

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] he played for nearly 16 years in the National Football League. Mr. Romanowski's career ended in September 2003 after he sustained a severe concussion. During Mr. Romanowski's football career Mrs. Romanowski cared for petitioners' children. Neither petitioner has significant experience in the field of tax.

From the late 1990s until early 2004 petitioners employed a financial adviser, Kathy Lintz. According to Mrs. Romanowski, Ms. Lintz "Basically * * * took care of everything" regarding petitioners' finances, including managing their portfolio and allocating them a monthly stipend. Ms. Lintz also collected relevant information from petitioners in order to have their tax returns prepared by a certified public accountant (C.P.A.) and reviewed the completed tax returns before sending them on to petitioners. Ms. Lintz is a certified financial planner, but she is not an accountant or an attorney.

During late 2003 petitioners had some tax issues regarding a real estate investment they had made in Colorado. Ms. Lintz advised them to seek help from a tax attorney in the area and put them in touch with Rodney Atherton in October 2003. Mr. Atherton was a partner at Greenberg Traurig, LP (Greenberg Traurig), and worked in several areas of law, including tax. He received a Juris Doctorate

[*4] from Washburn University in 1989 and an LL.M. in tax from the University of Denver in 1990. He was not knowledgeable in the field of horse breeding.

During October 2003 Mr. Romanowski met with Mr. Atherton at the Greenberg Traurig office in Denver. At the meeting they discussed petitioners' real estate investment issues as well as certain other issues. Mr. Atherton told Mr. Romanowski about a horse-breeding business, ClassicStar, which had retained Greenberg Traurig in July 2003 in connection with certain transaction and tax issues, including review of a tax opinion ClassicStar had received from another law firm. ClassicStar was working with Mr. Atherton, among others at Greenberg Traurig, to review the tax opinion.

Shortly after the meeting between Mr. Romanowski and Mr. Atherton, petitioners decided to retain Greenberg Traurig, and Mr. Romanowski expressed interest in receiving additional information about ClassicStar. Mr. Atherton provided petitioners with a variety of promotional materials regarding ClassicStar, as well as a booklet entitled "Due Diligence & Mare Lease Information Booklet" that contained information about the ClassicStar breeding program (program). None of the materials provided were prepared by Greenberg Traurig; rather, ClassicStar had given the materials to Mr. Atherton. Through these materials and conversations with Mr. Atherton, petitioners learned that the program involved

[*5] leasing mares owned by ClassicStar, which would provide boarding and care for the mares and breed the mares to stallions.  Any foals produced from the breeding would belong to petitioners.

The due diligence booklet petitioners received contained approximately 60 pages of form contracts and other information about the program.  In addition, the booklet contained:  (1) a 53-page opinion letter from the law firm Handler, Thayer & Duggan, LLC (Handler Thayer), regarding tax aspects of the horse-breeding business; (2) a 22-page opinion letter from the accounting and consulting firm Karren, Hendrix & Associates, P.C. (Karren Hendrix), regarding tax aspects of the horse-breeding business; and (3) a 6-page opinion letter from Karren Hendrix regarding tax aspects of NOLs arising from a horse-breeding business.  Each of the opinion letters was addressed to David Plummer, president of ClassicStar.  Both the Handler Thayer opinion letter and the 22-page Karren Hendrix opinion letter advised individual ClassicStar participants to consult with their own tax advisers about the tax consequences of participation in the program.

On October 23, 2003, Terry Green, an employee of  Karren Hendrix who did accounting work for ClassicStar, sent an "NOL illustration" regarding petitioners to Mr. Atherton.  He was the C.P.A. who had completed the Karren Hendrix opinion letters included in the ClassicStar due diligence booklet.  In the

**[*6]** NOL illustration Mr. Green estimated that petitioners needed an NOL of $13,092,732 to offset their taxable income from 1998 to 2003. Mr. Green prepared the NOL illustration using certain items of petitioners' financial information which had been provided to him.

At some point on or about November 3, 2003, Mr. Romanowski reviewed the materials provided to petitioners by Mr. Atherton. Mr. Atherton and Mr. Romanowski traveled to Kentucky to visit the ClassicStar facilities for a tour and to meet with ClassicStar employees. On November 9, 2003, Mr. Atherton and Mr. Romanowski again traveled to Kentucky. By this time Mrs. Romanowski had reviewed the materials and also made the trip to Kentucky. On the second trip petitioners toured the ClassicStar operation, saw horses, visited horse auction houses, and met with ClassicStar personnel. Petitioners were impressed with what they saw.

2. Petitioners' Participation in the Program

Petitioners reviewed multiple aspects of the program with Mr. Atherton and decided to enter the program during November 2003. Petitioners planned to spend $13 million on the program.[3] This was in spite of Ms. Lintz's adamant opposition

---

[3]Most of the $13 million would be financed with loans, as discussed further infra.

**[*7]** to the proposed $13 million dollar deal, which was based on her general impressions of the program gathered from what Mr. Romanowski and Mr. Atherton told her. However, Ms. Lintz did not review the specifics of the program. Ms. Lintz repeatedly told petitioners and Greenberg Traurig of her opposition to the deal, believing it to be a tax scheme and a significant threat to petitioners' financial security.

On December 15, 2003, petitioners created Romanowski Thoroughbreds, LLC (Romanowski Thoroughbreds), through which they would operate their activities. Petitioners were the sole owners, officers, and directors of Romanowski Thoroughbreds. During the tax years at issue, Romanowski Thoroughbreds did not maintain any bank accounts, credit cards, or lines of credit separate from petitioners'.

On December 26, 2003, petitioners wrote a $300,000 check to ClassicStar as a deposit toward the cost of their participation in the breeding program. On December 31, 2003, they signed a mare lease and board agreement (mare lease agreement) with ClassicStar on behalf of Romanowski Thoroughbreds. The mare lease agreement states that ClassicStar "is engaged in the business of leasing Thoroughbred mares for breeding purposes". Petitioners signed the mare lease agreement in the presence of Mr. Atherton and ClassicStar representatives while

[**\*8**] on another trip to the ClassicStar facilities in Kentucky. On the same day, petitioners also signed secondary documents with ClassicStar on behalf of Romanowski Thoroughbreds, including a boarding agreement, a foal agreement, and a nominee agreement.

Pursuant to the mare lease agreement Romanowski Thoroughbreds agreed to spend $13,092,072[4] on the breeding program to produce foals.[5] This $13,092,072 was due at the time petitioners signed the mare lease agreement, and the December 26, 2003, $300,000 deposit was applied toward the amount due. On December 29, 2003, Romanowski Thoroughbreds borrowed a total of $11,775,732 from National Equine Lending Co. (NELC). The total amount borrowed from NELC comprised two loans: a short-term loan of $5,229,366 and a long-term loan of $6,546,366. Petitioners both signed promissory notes on behalf of Romanowski Thoroughbreds for the NELC loans. Also on December 29, 2003, petitioners personally borrowed $1,017,127 from Keybank National Association

---

[4]The parties stipulated this figure, but a schedule of horses received the same day reflects expenses of $13,092,746. In addition, a 2003 income and expense summary petitioners later received showed $13,092,732 in expenses.

[5]These expenses included a fee to lease the mare, the breeding fee for the stallion, additional mare expenses, and prospective foal insurance expenses. Prospective foal insurance is obtained after pregnancy of a mare, to pay in the case of a failed pregnancy or foal death after birth.

[*9] (Key Bank). Both petitioners signed the Key Bank promissory note in their individual capacities. Petitioners also signed disbursement requests for both the Key Bank and NELC loans under which the proceeds of each loan were purportedly distributed directly to ClassicStar, minus certain fees.

Each loan was secured by the prospective foals and Romanowski Thoroughbreds' rights under the mare lease agreement. Mr. Atherton and/or ClassicStar suggested that petitioners use Key Bank and NELC for their breeding program loans, and petitioners did not shop for loans from other lenders. NELC's accounting was handled by Mr. Green, the CPA who did work for ClassicStar, and all NELC loan payments were to be mailed to the Karren Hendrix office at which Mr. Green worked. Petitioners were told that they were personally liable on the NELC loans; however, they actually were not. It appears that Mr. Atherton was the person who told this to petitioners, as he was present and assisting petitioners when they signed the NELC loan documents.

When petitioners signed the mare lease agreement, they had not negotiated or seen a list of the horse pairings they would receive for their breeding program. Rather, they relied on ClassicStar to pick the horse pairings they would receive and to set the fees and expenses they would pay for each pairing. The same day petitioners signed the mare lease agreement they received a list of the horse pairs

**[\*10]** which they would receive; this list indicated that petitioners would receive 68

pairings. However, Mr. Atherton recognized that very few of the horses were

thoroughbreds and alerted petitioners. In fact, only 4 of the 68 listed pairings were

thoroughbred horses; the remaining pairings were quarter horses.[6] The total cost to

produce foals from the four listed thoroughbred breeding pairings was $1,047,419 of

the $13,092,072 in total expenses.

Petitioners initially intended to lease only thoroughbred horses.[7] Despite

the fact that over 90% of the horses on the schedule were quarter horses,

petitioners chose to continue with the program, after consulting with Mr. Atherton.

Petitioners claim that they had an oral agreement with ClassicStar under which it

would substitute an unknown number of thoroughbred pairings in for the listed

quarter horse pairings. However, petitioners did not receive any written

assurance/agreement stating that ClassicStar would substitute thoroughbred

pairings for the listed quarter horse pairings. Petitioners also claim they later

made several attempts to get ClassicStar to substitute thoroughbreds for the listed

---

[6]The two breeds of horses petitioners dealt with were thoroughbreds and quarter horses. Certain rules apply to the breeding of the different breeds. Thoroughbred horses are generally worth more than quarter horses.

[7]The parties stipulated that "On the same day petitioners signed their mare lease contracts, ClassicStar told petitioners they did not have sufficient thoroughbred mares with which to fulfill its contractual obligations to petitioners."

[*11] quarter horses without success; these claims are addressed further infra. The quarter horse pairings listed were never bred on behalf of petitioners; they were merely placeholders.

Petitioners received two other schedules of horse pairings during 2004. The first additional schedule is undated and reflects 60 horse pairings (of which five are thoroughbred pairings) costing a total of $13,092,732. The listed cost on the schedule to produce the five thoroughbred foals is $1.5 million. The final schedule is dated December 15, 2004, and reflects only six horse pairings costing a total of $1.5 million. All pairings on the final schedule are thoroughbred pairings. Only three of these six pairings were listed on the original schedule received on December 31, 2003. However, each of these three remaining pairings had a price to produce a foal that was different from the price on the original schedule. All changes to the schedules of horses were made by ClassicStar. Petitioners received no additional horse pairings in later years.

Each of the six thoroughbred pairings listed on the final schedule of horses was bred in 2004 and produced a foal in 2005 after an 11-month gestation period. Petitioners received some updates on the pregnancies of their mares and a notification upon the birth of each of the six foals. On April 2, 2005, petitioners contributed their six foals (two of which had not yet been born) to ClassicStar

[*12] 2005 PowerFoal Stable, LLC (PowerFoal). According to a letter to petitioners from ClassicStar, multiple thoroughbred foal owners contributed their foals to PowerFoal as a form of risk sharing/reduction. Petitioners received a 5.88% interest in PowerFoal that was based upon a value assigned to their foals of $1.5 million.

At some point petitioners' six former foals were sold by PowerFoal at what Mr. Romanowski described as "a little bit of a fire sale" without petitioners' knowledge. The sale of the foals was completed at the direction of ClassicStar personnel. Sale receipts showed that two of the foals were sold in August 2006 for a total of $875,000 and another foal was sold in October 2006 for $50,000. Each of these three foals was sold through Fasig-Tipton Kentucky, Inc., a thoroughbred horse auctioneer. Information regarding sales of the remaining three foals was not produced.

Petitioners received an income and expense summary for 2003 from ClassicStar which showed total expenses of $13,092,732, comprising board and mare care expenses of $1,020,000, breed fees of $868,000, mare lease fees of $9,496,200, and insurance expenses of $1,708,532. The income and expense summary listed no income. Petitioners listed these expenses and income on their 2003 Schedule F, Profit or Loss From Farming, and claimed a resulting deduction

**[*13]** of $13,092,732. This deduction offset their 2003 income and NOLs were carried back to 1998, 1999, 2000, 2001, and 2002.

Petitioners made notes of their hours spent on activities related to horse breeding during 2003. They gave these notes to Mr. Atherton, who compiled a log reflecting 193 hours spent by petitioners on horse-breeding activities. Most of the hours were attributable to petitioners' visits to Kentucky, discussions with Mr. Atherton and ClassicStar personnel, and review of the ClassicStar materials provided to them. Petitioners also subscribed to and read horse magazines as part of their activities.

3. Further Financial Information

    A. Petitioners' 2004 Schedule F

On their 2004 Schedule F petitioners listed total farming expenses of $488,451 and no farming income. The expenses comprised $482,055 in interest expenses, $5,181 in travel expenses, and $1,215 in meals and entertainment expenses. A time log for 2004 showed petitioners spent 88 hours on their horse-breeding activities during that year.

    B. Key Bank and NELC Loans

Key Bank and ClassicStar had a financial relationship dating back to 2001, when the two entities established a program whereby borrowers would "use the

[*14] proceeds of  * * * [a Key Bank] loan to enter into a Mare Lease tax deferred strategy with ClassicStar."  According to a Key Bank document regarding such loans, Key Bank would not rely "on the cash flow from the investment as a source of repayment".  The document also stated that Key Bank would make such "loans based largely on the prospect for significant future business from these borrowers".  On December 21, 2001, ClassicStar and Key Bank entered into a formal agreement regarding the loans; this agreement included a provision stating that ClassicStar would buy loans made under the agreement which were in default as well as certain other provisions designed to protect Key Bank from loan losses.

The Romanowskis paid interest on their Key Bank loan in both 2004 and 2005.  ClassicStar made a $1,017,379 payment to Key Bank on January 17, 2006, satisfying the outstanding Key Bank loan principal and interest.  According to Mr. Romanowski, this payment was made using proceeds from the sales of foals held by PowerFoal.

On April 16, 2007, petitioners received a 2006 Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., from PowerFoal reflecting their share of income of $921,104 and property distributions to them of $900,470.  It appears that the Schedule K-1 was sent as a result of sales of horses by PowerFoal.

[*15] Petitioners informed their return preparer[8] that they received no such distribution from PowerFoal and the income to them shown on the Schedule K-1 was not included on their 2006 tax return. Petitioners filed a Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR), with their 2006 tax return.

Mr. Romanowski (on behalf of Romanowski Thoroughbreds) received a letter from NELC dated August 24, 2004, which notified him that the short-term NELC loan had gone into default and NELC was seeking payment. The letter states that "We are pursuing our rights against the property as provided in the security agreement, which includes forclosure [sic]." A similar letter dated July 9, 2007, was sent to Mr. Romanowski (on behalf of Romanowski Thoroughbreds) regarding the long-term NELC loan. That note demanded payment of interest and principal totaling $8,068,760. Mr. Atherton reviewed the notices and advised petitioners not to pay the outstanding amounts because ClassicStar had not "fulfill[ed] their end of the deal" with petitioners regarding exchanging leased quarter horse pairings for thoroughbred pairings.

---

[8]Timothy Watson prepared petitioners' 2006 tax return, as well as their 2003 and 2004 returns. Further information about Mr. Watson is discussed infra.

**[\*16]**  In October 2004 petitioners received a Federal income tax refund of approximately $3.9 million.  On November 17, 2004, they made a payment of $3 million on the short-term NELC loan by bank wire.[9]  Of the $3 million, $427,054 was paid toward accrued interest and the remaining $2,572,945 was paid toward loan principal.  This was the only payment made on either NELC loan by petitioners.

An amortization schedule for the short-term NELC loan shows that on June 30, 2007, a payment of approximately $3.5 million was made on the loan, satisfying all outstanding amounts of loan interest and principal.  It is not clear who made this payment.  Similarly, an amortization schedule for the long-term NELC loan shows that a payment of $8,058,122 was made on that loan by an unknown party on June 30, 2007, satisfying all outstanding amounts of loan interest and principal.  In addition, a PowerFoal distribution worksheet for January 2007 shows that Romanowski Thoroughbreds was to receive $44,893 from PowerFoal that month, but that instead of sending a check to Romanowski Thoroughbreds, PowerFoal would send a check "to NELC on behalf of

---

[9]It was not clear whether Mr. Atherton had already advised petitioners not to pay the NELC loans at this point.

**[*17]** Romanowski Thoroughbreds." The amortization schedules for the NELC loans do not reflect a payment of $44,893 at any point.

### C. ClassicStar Bankruptcy and Lawsuits

ClassicStar filed for chapter 11 bankruptcy protection on September 14, 2007. Petitioners filed a claim in the bankruptcy proceeding and also filed separate claims against ClassicStar (and related persons/entities) and Greenberg Traurig in Federal and State court, respectively, for financial damages incurred as a result of their participation in the program.

## 4. Due Diligence

### A. Mr. Atherton

Mr. Atherton extensively advised petitioners on the tax treatment of their transactions relating to the program both before and after they entered the program. Petitioners relied on Mr. Atherton's advice in claiming the previously discussed tax deductions attributable to their participation in the program.

As previously stated, Mr. Atherton and others at Greenberg Traurig represented ClassicStar regarding certain legal matters. Petitioners were aware of the dual representation and signed a waiver of conflicts acknowledging that Greenberg Traurig did work for both petitioners and ClassicStar. The waiver also states that ClassicStar would pay the legal fees associated with petitioners'

[*18] participation in the program but does not state that Mr. Atherton or Greenberg Traurig would receive any other benefits as a result of petitioners' participation in the program.

Although he testified multiple times to the contrary, the evidence is clear that Mr. Atherton received improper payments from ClassicStar as a result of petitioners' choosing to enter the program. Mr. Atherton claimed that multiple documents regarding payments he received from ClassicStar were sent to him (from ClassicStar) in error. Many of those documents were chain emails which contained conversations between Mr. Atherton and ClassicStar employees in which Mr. Atherton used terms such as "fee splits" and "percentage" when discussing the amount of money ClassicStar would pay to him or Greenberg Traurig for bringing people into the program.

Mr. Atherton's claim that he did not receive improper payments as a result of petitioners' (and other's) participating in the program seems to be based on how Mr. Atherton accounted for these payments. It appears that once a client of Mr. Atherton's entered into the program, ClassicStar would pay Mr. Atherton/Greenberg Traurig a percentage of the amounts actually paid to

[*19] ClassicStar by that client.[10]  Mr Atherton would then sequester those funds and bill against them at an hourly rate much higher than his normal hourly rate.  For example, in an email to a client other than petitioners, Mr. Atherton stated:  "Here is what I propose, I simply bill my time on your clients at a premium--I usually bill 365 an hour.  Are [sic] okay if I bill 1000 an hour and just charge an hourly rate?"  In the email Mr. Atherton further states that it might be best to "cap my fees at 3%."

Mr. Atherton never told petitioners of his improper relationship with ClassicStar.  At some point Ms. Lintz became aware that Mr. Atherton was receiving a "due diligence fee".[11]  This fee concerned Ms. Lintz, as she considered it a conflict of interest which called Mr. Atherton's independence into question.  Ms. Lintz was not certain the fee was being paid by ClassicStar, testifying that she "believe[d]" the fee was being paid by ClassicStar, but "may have assumed that".

---

[10]Notably, the percentage commission was calculated only on the amounts actually received by ClassicStar--i.e., personal funds paid by clients and funds received by ClassicStar resulting from recourse loans (the Key Bank loan in petitioners' case).  Mr. Atherton/Greenberg Traurig did not receive any proceeds based on the amount of nonrecourse loans (the NELC loans in petitioners' case).

[11]Ms. Lintz had a discussion with Mrs. Romanowski relating to Mr. Atherton's receipt of some form of additional money; the record is unclear whether Mrs. Romanowski referred to the additional money as a bonus paid by Greenberg Traurig to Mr. Atherton or another type of payment.  In any event, Ms. Lintz became suspicious and called Mr. Atherton, who told her that he received a "due diligence fee".

[*20] Ms. Lintz had several heated conversations with Mr. Atherton and others at Greenberg Traurig regarding Mr. Atherton's relationship with ClassicStar. However, exactly what Ms. Lintz told petitioners about Mr. Atherton's independence is somewhat unclear. Ms. Lintz testified that she "indicated" to petitioners that Mr. Atherton "was not independent" and that they "should get [an] independent review" of the program. However, it appears Ms. Lintz never directly told petitioners that Mr. Atherton was receiving a financial benefit from ClassicStar as a result of petitioners' entry into the program.[12] Ms. Lintz also testified that she did not know how any amounts received by Mr. Atherton were calculated.

B. Mr. Watson

Petitioners' 2003 and 2004 Federal tax returns were prepared by Timothy Watson. Mr. Watson also prepared petitioners' Forms 1045, Application for Tentative Refund, for years 1998 through 2002, as well as petitioners' tax returns for years after 2004. He remains petitioners' current tax return preparer.

---

[12]Most of Ms. Lintz's conversations were with Mrs. Romanowski. At one point during testimony Ms. Lintz was asked "Do you recall what Julie Romanowski's response was to any of the fees that were being paid to [Mr. Atherton?]" Ms. Lintz responded "Well, I think she knew that they were there, but I don't think, I don't remember her making a judgment or, she--you know, once again, I don't know that she had the context in which to understand if that was reasonable or not reasonable." (Emphasis supplied.)

[*21] Mr. Watson is a C.P.A. licensed in Colorado, has a bachelor of science in accounting from the University of Colorado, a master's in business administration and a master's in tax from the University of Denver, had over two decades of accounting experience at the time he prepared petitioners' 2003 and 2004 tax returns, and was a partner in the accounting firm Hulet, Watson & Associates, P.C. In addition, Mr. Watson had previously completed Schedules F for other clients and was familiar with the rules regarding claiming NOLs as a result of farming activities.

Mr. Atherton recommended Mr. Watson to petitioners in January 2004 and petitioners hired Mr. Watson in either late January or early February 2004. Mr. Watson had no prior relationship with Mr. Atherton and no relationship with ClassicStar. Petitioners paid Mr. Watson for preparing their tax returns and Forms 1045 and relied on him to properly prepare those documents.

In connection with preparing petitioners' tax returns, Mr. Watson discussed ClassicStar with one of the accountants in his firm who had previously prepared a tax return for a ClassicStar client. This accountant had visited the ClassicStar facilities. Mr. Watson also reviewed certain documents relating to petitioners' participation in the program,[13] discussed the program with Mr. Atherton, and had

---

[13]The documents Mr. Watson reviewed included the opinion letters contained in the ClassicStar due diligence booklet provided to petitioners, petitioners'
(continued...)

[*22] at least one discussion with petitioners. Mr. Atherton told Mr. Watson all loans taken by petitioners in connection with the program were recourse loans, an assertion Mr. Watson took at face value. Mr. Watson was not aware that Mr. Atherton received commissions from ClassicStar. In addition, Mr. Watson appears never to have asked for information regarding the horses leased by petitioners and was never told that there were issues regarding quarter horses and thoroughbred substitutions at the time he prepared the relevant tax returns and Forms 1045. However, Mr. Watson indicated that he received all documents and information which he requested from petitioners.

## C. Other Due Diligence Information

On February 4, 2004, Ms. Lintz resigned as petitioners' financial adviser, partially because of petitioners' investment in the program. Ms. Lintz's resignation letter states that petitioners choose to "enter into an aggressive tax shelter", presumably the program. The resignation letter also cites petitioners' purchase of a new home and certain real estate investments as reasons for the

---

[13](...continued)
participation logs, petitioners' past tax returns, the 2003 income and expense summary prepared for petitioners by ClassicStar, and certain other documents relating to petitioners' horse-breeding activities

[*23] resignation but does not mention anything about Mr. Atherton's having a conflict of interest regarding ClassicStar.

On February 10, 2004, Ms. Lintz sent petitioners another letter identifying two independent horse/tax experts whom petitioners could contact if they "need[ed] further assistance". The letter states that one of the experts told Ms. Lintz that ClassicStar had "come on strong in the last couple of years" and that there had been "No scandals thus far" even though "some of the principals were involved in bad prior deals." The letter does not mention Mr. Atherton.

5. Nutritional Supplements

During his football career Mr. Romanowski took several nutritional supplements which he credits with helping him play professional football for 16 years. During the later years of his football career Mr. Romanowski became familiar with a company named Cytosport, which provided supplements for his team. When he realized in late 2003 that he would never play football again, Mr. Romanowski sought to get involved with the nutritional supplements business and became a paid consultant for Cytosport in January 2004. Mr. Romanowski had several duties in this position, including involvement in sales and distribution of Cytosport products.

**[\*24]**  One of the Cytosport employees, Robert Fritz, had his own company, Animal Naturals, which sold a product called Show & Go.  Animal Naturals advertised Show & Go as an "Equine Health, Performance & Body Builder" which would help horses perform and look better.  Mr. Romanowski had several talks with Mr. Fritz about the product during 2004 and had Mr. Fritz send free samples of Show & Go to several horse stables, including ClassicStar.  Mr. Romanowski also had Mr. Fritz send a sample to Mr. Atherton.  Mr. Fritz sent these samples in the hopes of gaining customers.[14]  Mr. Romanowski and Mr. Fritz never discussed entering into a partnership or other business related to Show & Go, and Mr. Romanowski never had an ownership or financial interest in the product.

6.  Expert Witnesses and Their Reports

Both respondent and petitioners submitted expert reports, and petitioners also submitted a rebuttal report.  Respondent's expert was Andrew Havens, and petitioners' expert was Michelle Stallings.  Mr. Havens is president of a company which represents horse owners at auctions, among other services.  Ms. Stallings has extensive experience in equine appraisals and other aspects of the equine industry. The parties agreed that both experts were qualified to testify in this case.

---

[14]Mr. Fritz did not receive sale orders from any of the stables which he sent the samples to.

[*25] Mr. Havens' expert report concluded that petitioners' horse-breeding activities "had absolutely no chance of making a profit". Mr. Havens criticized petitioners on a variety of grounds, including that they: (1) allowed ClassicStar to make all horse selection and pricing decisions; (2) significantly overpaid for the leased mares "to a truly astounding degree"; (3) overpaid for related items, such as insurance expenses; and (4) lacked any way to determine which horses were actually bred for them. While Mr. Havens estimated the values of the mares on various horse-breeding schedules petitioners received, he did not provide a method of appraisal or estimate values for prospective foals produced by the pairings listed on the breeding schedules. At trial Mr. Havens testified that he valued the horses using a combination of age, pedigree, and racing winnings, among other factors.

In her rebuttal report, Ms. Stallings agreed with Mr. Havens "that there was absolutely no chance that any of the non-Thoroughbred horses listed on * * * [petitioners' breeding schedules] would produce profitable foals." However, she disagreed with his assessment of petitioners' breeding program as a whole, on the basis of her opinion that the quarter horses were never intended to be bred. Rather, Ms. Stallings stated that the quarter horses "were obviously placeholders" and that if ClassicStar "had honored their contract and provided Thoroughbred

[*26] mares of at least the same quality as those * * * [eventually bred for petitioners] then there was definitely profit potential."  Ms. Stallings also stated that: (1) the various expenses charged to petitioners for items such as insurance were not unreasonable, and (2) "there was no reason to suspect that the mare leasing program was not legitimate at the time the Romanowskis signed up to participate."  In addition, she testified that exchanging one horse for another was not uncommon in the breeding industry.

In her original expert report Ms. Stallings gave a total fair market value appraisal of prospective foals[15] produced from the six thoroughbred pairings bred for petitioners at $6,165,000.  She concluded that "In the event that Romanowski Thoroughbreds LLC had received approximately 18 additional mares of equal value",[16] petitioners would have received foals with an estimated value of nearly $25 million, compared with approximately $13 million in expenses.  However, because of an error in the spreadsheet program Ms. Stallings used, the total

---

[15]Ms. Stalling appraised prospective foals rather than the actual foals produced because the actual foals had not been born at the time the mare lease agreement was signed.

[16]The "18 additional mares" figure was made up by Ms. Stallings as part of an example; there is no evidence that petitioners were ever offered or led to believe ClassicStar would be providing them with 18 additional thoroughbred mares.

[*27] appraised value of the six prospective foals was overstated by approximately $2 million, and her extrapolated estimate including 18 additional mares was overstated by approximately $8 million. Even considering this error, Ms. Stallings concluded that petitioners' breeding activities were profitable, assuming that they received the hypothetical 18 additional mares. The amount of projected profit using her error-free appraisal value and including the hypothetical additional 18 mares was approximately $4 million.

In appraising the six thoroughbred pairings petitioners actually received, Ms. Stallings used only the sale prices of other foals sired by the stallions (but not the mares) petitioners received in their pairings, reasoning that such foals would be comparable to the foals petitioners would receive. Out of these comparables, she favored "the highest priced foal[s]" because petitioners "were supposed to receive the best mares" from ClassicStar. Her basis for this belief was representations made by ClassicStar in documents such as the promotional materials and the due diligence booklet.

7. Additional Information

Before their involvement with ClassicStar, petitioners had owned a quarter horse for less than a year. Petitioners did not breed, race, or otherwise attempt to make money on this horse. Petitioners gave the horse away when Mr.

[*28] Romanowski was traded to a different football team and had no other involvement with horses until the ClassicStar deal.

On April 30, 2010, respondent issued a notice of deficiency to petitioners for 1998, 1999, 2000, 2001, 2002, 2003, and 2004 determining deficiencies resulting from the disallowance of all Schedule F expenses petitioners claimed for 2003 and 2004, disallowance of related NOLs, and certain computational adjustments. Petitioners timely filed a petition contesting the deficiencies and penalties.

OPINION

I. Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they have met all requirements necessary to be entitled to the claimed deductions. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

[*29] The parties have raised a number of arguments regarding the deductibility of expenses associated with petitioners' horse-breeding activities.[17] The parties agree that petitioners do not bear the burden of proof with regard to every issue. However, because we decide the relevant issues on the basis of the preponderance of the evidence, we need not discuss which party has the burden of proof for each issue. See Knudsen v. Commissioner, 131 T.C. 185 (2008). The burden of proof with regard to the accuracy-related penalties is discussed in that section of the opinion.

## II. Section 183 For-Profit Requirement

Section 183(a) provides in part that "In the case of an activity engaged in by an individual * * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(c) provides that "For purposes of this section, the term 'activity not engaged in for profit' means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 for expenses of carrying on activities that constitute a trade or

---

[17]Most of these arguments are not addressed in this opinion because we decide the case in respondent's favor on the basis of sec. 183.

[*30] business and under section 212 for expenses incurred in connection with activities engaged in for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. Deductions are not allowable under section 162 or 212 for the expenses of an activity that is not engaged in for profit.

An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective in engaging in the activity. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's expectation of profit must be in good faith. Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing section 1.183-2(a), Income Tax Regs.). Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd,792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his

**[\*31]** or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor controls. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981). Considering these factors, we find that petitioners' horse-breeding activities were not engaged in for profit.

A. Manner in Which the Taxpayer Carries On the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners argue that this factor favors them because they conducted due diligence on the program, formed Romanowski Thoroughbreds through which they entered the mare lease contract, and "maintained extensive records". We disagree. Petitioners relied on ClassicStar to an extreme degree, and had no discernable business plan or profit

**[*32]** projections other than projections provided by Mr. Green (who did accounting work for ClassicStar).

Petitioners intended to contract for thoroughbred pairings. However, the schedule of horses they received the same day they signed the mare lease agreement reflected only 4 thoroughbred pairings out of 68 total pairings. In spite of this, petitioners did not cancel the deal or get anything in writing stating that ClassicStar had an obligation to substitute out the 64 quarter horse pairings for (an unknown number of) thoroughbred pairings. Rather petitioners claim to have had an oral agreement with ClassicStar regarding substitution of thoroughbreds for quarter horses. Petitioners also claim that they continually sought to have ClassicStar actually make the substitutions beginning in early 2004, without success. Considering the millions of dollars at stake and ClassicStar's continuous failure to make the substitutions, we find petitioners' failure to abrogate the mare lease agreement or to get anything in writing regarding a substitution agreement is strong evidence that their horse-breeding activities were not carried on in a businesslike manner.

Petitioners testified that they could have made a profit in their horse-breeding activities by selling or racing any foals they would own, as well as getting involved in the horse supplement business. However, petitioners took no

[*33] steps toward racing the foals (indeed, all foals were contributed to PowerFoal either before or shortly after birth) they owned, and their "involvement" in the horse supplement business ended after Mr. Romanowski asked Mr. Fritz to send out free samples of Show & Go to various stables. Petitioners never had a monetary interest in Show & Go, never discussed a partnership or other deal with Mr. Fritz, and provided no evidence that they ever seriously considered developing, distributing, or otherwise profiting from another horse supplement.

Petitioners ended up contributing their six foals (some before birth) to PowerFoal, an LLC with a substantial relationship to ClassicStar. This was in spite of the fact that petitioners claim ClassicStar repeatedly refused to provide them with the remaining thoroughbred horse pairings to which they were entitled. PowerFoal proceeded to sell the foals at what Mr. Romanowski described as "a little bit of a fire sale" without petitioners' knowledge. This sale was completed at the direction of ClassicStar personnel, and details of only three of the six sales were provided.

Petitioners failed to take action when ClassicStar listed placeholder quarter horses instead of thoroughbreds on their initial and second schedule of horses. Instead, they claim to have relied on the oral assurances of ClassicStar, even

**[*34]** though ClassicStar continually failed to substitute the quarter horses for thoroughbreds. Petitioners proceeded to contribute the thoroughbred foals they did receive to an entity with a substantial relationship to ClassicStar, even though they had millions of dollars on the line and had already been shortchanged by ClassicStar. These are not the markings of an activity which is carried on for profit.

We find this factor favors respondent.

B. Expertise of the Taxpayers or Their Advisers

Preparation for an activity by extensive study of its accepted business and economic practices or consultation with those who are expert therein, may indicate that a taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners claim this factor favors them because "they extensively studied the horse industry in general and spent substantial time educating themselves on their new venture" and relied on the advice of ClassicStar and Mr. Atherton. We disagree.

Although petitioners claim to have relied on the advice of ClassicStar, ClassicStar was not an expert hired by petitioners. Rather, it was a for-profit company with which petitioners (through Romanowski Thoroughbreds) had entered into business. We do not believe reliance on such advice was reasonable.

**[*35]** Mr. Atherton was not an expert in the horse-breeding industry and did not give petitioners advice on which horses to breed. He testified that he had no "knowledge about [thoroughbred] bloodlines" and that he did not select any horse pairings for petitioners. Even if we accept petitioners' claim to have relied on Mr. Atherton "to review the business opportunity and offer legal and financial advice", such advice would not reach the heart of petitioners' venture: horse breeding.

Petitioners' logs reflect that they collectively spent 193 hours during 2003 and 88 hours during 2004 participating in horse-breeding-related activities such as visiting the ClassicStar facilities and reading about the industry. However, the expert reports and testimony make it clear that the horse industry is a difficult industry and that it takes years of experience to succeed in without expert advice. In spite of the difficulty of the business, petitioners entered into a breeding contract for over $13 million relying only on a nominal amount of education, the advice of a for-profit company which was the other party to the contract, and an attorney who was not an expert in horse breeding.

We find this factor favors respondent.

C. <u>Time and Effort Expended by the Taxpayer in Carrying On the Activity</u>

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an objective to derive a profit, particularly if

**[\*36]** the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners introduced records indicating that they collectively spent 193 hours during 2003 and 88 hours during 2004 participating in horse-breeding-related activities such as visiting the ClassicStar facilities, reading about the horse industry, discussing the industry and financials with Mr. Atherton and ClassicStar personnel, and reviewing the ClassicStar materials.

Considering the number and quality of hours petitioners spent related to their breeding activities, we find this factor is neutral.

D. Expectation That Assets Used in the Activity May Appreciate in Value

A taxpayer may intend, despite a loss from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized. Sec. 1.183-2(b)(4), Income Tax Regs. "There is an overall profit if net earnings and appreciation are sufficient to recoup losses sustained in prior years." Filios v. Commissioner, T.C. Memo. 1999-92, slip op. at 17 (citing Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967)), aff'd, 224 F.3d 16 (1st Cir. 2000). Petitioners argue that they intended and expected their foals to appreciate in value so that they would realize an overall profit as a result of their horse-breeding activities. They request that we find this

[*37] factor favors them on the basis of hypothetical foals they would have received had ClassicStar substituted thoroughbred pairings for the quarter horse pairings listed on their schedules of horses. However, considering the transaction as a whole, we find this factor favors respondent.

We first note that petitioners engaged in a circular transaction with respect to the six thoroughbred pairings that were actually bred for them. The foals resulting from these six pairings were contributed to PowerFoal and (it appears) ClassicStar paid off petitioners' Key Bank loan as a result of the contribution. As previously discussed, PowerFoal had a substantial relationship to ClassicStar and the financial details regarding PowerFoal and the sale of petitioners' six (former) foals are murky; petitioners were not aware their former foals were being sold, and records for only three of the sales were produced. Petitioners contributed the foals to PowerFoal in spite of their claim that ClassicStar continually failed to uphold its end of the mare lease agreement by not substituting thoroughbred pairings for quarter horse pairings.

We believe that petitioners never intended to profit from the contribution of their six foals to PowerFoal. Rather, we believe that petitioners merely contributed these horses to PowerFoal with the understanding that their Key Bank loan would be paid off as a result of the contribution. There is no evidence that

**[*38]** petitioners would not have taken part in a similar deal with respect to the NELC loans had they received any additional thoroughbred foals. Indeed, petitioners' past actions coupled with the suspect relationship between NELC and ClassicStar (Mr. Green did accounting work for both entities and all payments on NELC loans were to be mailed to the office at which Mr. Green worked) make such a potential circular transaction seem likely to occur.

In addition to the circular transaction aspect of their deal with ClassicStar (and the potential for another/other circular transaction(s) had petitioners received any additional thoroughbred foals), petitioners' claim that they expected their horse-breeding activities to become profitable had ClassicStar made the thoroughbred substitutions is vague. Petitioners never indicated how many thoroughbred pairings they expected to eventually receive from ClassicStar, and they had no idea which horses would have made up such pairings.

Petitioners' expert, Ms. Stallings, based her conclusion that petitioners' activities had an expected profit on petitioners' receiving an additional 18 thoroughbred pairings of similar quality to the 6 pairings that were bred for petitioners. Not only did she assume the number and quality of the additional pairings; Ms. Stallings also failed to account for the fact that petitioners entered into a circular transaction (apparently without any profit potential) with respect to

**[\*39]** the six foals they did receive.  In addition, Ms. Stallings' prospective foal

appraisals relied on ClassicStar's representations that petitioners would receive

high-quality mares even though ClassicStar repeatedly showed itself to be a devious

and untrustworthy entity.  We do not find Ms. Stalling's conclusion regarding the

profitability of petitioners' horse-breeding activities to be credible.

Considering petitioners' vague claim of an expected profit in conjunction with

the circular thoroughbred foal transactions which apparently did occur, we believe

petitioners did not expect their (mostly hypothetical) foals to appreciate in value to

the point where they would recognize a profit as a result of their horse-breeding

activities.

We find this factor favors respondent.

E.  <u>Success of the Taxpayer in Carrying On Other Similar or Dissimilar
   Activities</u>

The fact that a taxpayer has engaged in similar or dissimilar activities in the

past and converted them from unprofitable to profitable enterprises may indicate

that he is engaged in the present activity for profit, even though the activity is

presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  No evidence was

presented that either of petitioners ever engaged in any business activities before

[*40] entering into the mare lease agreement.  The parties agree that this factor is neutral, and we agree.

F.  Taxpayer's History of Income or Losses With Respect to the Activity

Where losses continue to be sustained beyond the period which customarily is necessary to bring an operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.  Because petitioners participated in the program for only one breeding season, we find this factor is neutral.

G.  Amount of Occasional Profits

The amount of any occasional profits the taxpayer earned from the activity may show that the taxpayer had a profit motive.  See sec. 1.183-2(b)(7), Income Tax Regs.  An occasional small profit from an activity generating large losses or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit.  Id.  In addition "A small chance to make a large profit may indicate that a taxpayer has a profit objective even if he or she has large continuous losses."  Lundquist v. Commissioner, T.C. Memo. 1999-83, slip op. at 27 (citing section 1.183-2(b)(7), Income Tax Regs.), aff'd, 211 F.3d 600 (11th Cir. 2000).

**[*41]** Petitioners recognize that their horse-breeding activities "did not generate any net profit." Although petitioners might have had a very small chance to make a profit had they sold the six thoroughbred foals bred for them, petitioners instead entered into a circular transaction which appears to have had no profit potential; instead it appears that petitioners' Key Bank loan was paid off as a result of the contribution.

We find this factor favors respondent.

H. Financial Status of the Taxpayer

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit. Id. We have recognized that "As long as tax rates are less than 100 percent, there is no 'benefit' in losing money." Engdahl v. Commissioner, 72 T.C. 659, 670 (1979).

The losses sustained by petitioners did provide them with significant tax benefits. Not only did petitioners attempt to offset their income from 2003 and 2004 with the losses; petitioners also carried back losses to 1998, 1999, 2000,

[*42] 2001, and 2002. In addition many of the losses petitioners claimed were not actual economic losses. Petitioners were apparently involved in a circular transaction to pay off the Key Bank loan and only partially paid one of the NELC loans (using a portion of their tax refund). Petitioners made no further payments on either of the NELC loans, and on June 30, 2007, an unknown person/entity made payments totaling approximately $11.5 million in satisfaction of the outstanding principal and interest on petitioners' NELC loans.

We recognize that tax planning is often a consideration when deciding whether to enter a business. However, this case does not represent a normal instance of tax planning. Rather, we believe petitioners' participation in the program was almost entirely motivated by tax benefits available to them through such participation.

We find this factor favors respondent.

I. Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. Although horse breeding may involve elements of enjoyment and Mrs. Romanowski testified that she personally enjoyed some aspects of the activity, we do not

**[\*43]** believe that petitioners were significantly motivated by the recreational elements. Petitioners did not have significant interaction with their mares or foals and delegated essentially all the breeding work to ClassicStar. Petitioners were also not heavily involved in the sale/exchange of their foals; they contributed the foals to PowerFoal, which proceeded to sell the foals without petitioners' knowledge.

We find this factor favors petitioners.

J.  Section 183 For-Profit Requirement Conclusion

Considering the factors discussed above, we find that petitioners' horse-breeding activities were not engaged in for profit, and the related expenses are therefore not deductible under section 162 or 212 for the years at issue. Respondent's determination of a deficiency based on that determination is sustained.

III. Accuracy-Related Penalties

Respondent determined that petitioners are liable for 20% accuracy-related penalties under section 6662(a) and (b)(1) for negligence or disregard of rules and regulations, or in the alternative, under section 6662(a) and (b)(2) for substantial understatement of income tax. Respondent determined that these penalties should apply for 1998, 1999, 2000, 2001, 2002, 2003, and 2004. Petitioners contest the

[*44] imposition of accuracy-related penalties, arguing that they reasonably and in good faith relied upon the advice of Mr. Atherton and Mr. Watson, among other arguments. We agree that petitioners reasonably and in good faith relied upon the advice given to them by Mr. Atherton and Mr. Watson.

Pursuant to section 6664(c)(1), the accuracy-related penalty under section 6662 does not apply to any portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause, and (2) acted in good faith. Dunlap v. Commissioner, T.C. Memo. 2012-126, slip op. at 69. The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. These circumstances include the experience, knowledge, and education of the taxpayer, as well as the extent to which the taxpayer reasonably and in good faith relies on the advice of a professional tax adviser. Id.

The U.S. Supreme Court has stated that--

> When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" do not demand such actions. [Emphasis supplied.]

[*45] United States v. Boyle, 469 U.S. 241, 251 (1985).  However, reliance upon an adviser is generally unreasonable when that adviser has an inherent conflict of interest that the taxpayer knew or should have known about.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Petitioners are unsophisticated in the field of tax.  They were referred to Mr. Atherton by Ms. Lintz and knew Mr. Atherton to be an accomplished lawyer familiar with tax law.  They relied on the advice of Mr. Atherton in claiming tax deductions based on their participation in the program.  In addition to Mr. Atherton, petitioners also hired Mr. Watson, who was a very experienced and highly accomplished accountant.  Mr. Watson echoed Mr. Atherton's statements that petitioners' claimed deductions were proper.  While he does not contest the qualifications of Mr. Atherton and Mr. Watson, respondent argues petitioners did not reasonably and in good faith rely on the advice given to them by Mr. Atherton and Mr. Watson.

It has been clearly shown that Mr. Atherton had a conflict of interest regarding ClassicStar.  Less clear is whether petitioners were aware (or reasonably should have been aware) of this conflict of interest.  Ms. Lintz testified that she "indicated" to petitioners that Mr. Atherton "was not independent" and that they

**[\*46]** "should get [an] independent review" of the program.  Ms. Lintz also testified that she believed petitioners were aware that Mr. Atherton was paid a fee by ClassicStar for his services.  Ms. Lintz admitted she did not know how any fee was calculated and thus could not have relayed such information to petitioners.

The mere fact that petitioners were aware that Mr. Atherton received some financial benefit as a result of their participation in the program is not sufficient to show that they could not rely on him in good faith, as petitioners were aware that Mr. Atherton would bill the hours he spent working on the transaction.  See 106 Ltd. v. Commissioner, 136 T.C. 67, 80 (2011) (reliance upon an adviser may be reasonable when the adviser "has no stake in the transaction besides what he bills at his regular hourly rate"), aff'd, 684 F.3d 84 (D.C. Cir. 2012).  Mrs. Romanowski also testified that she believed Mr. Atherton might have received some financial benefit in the form of a bonus paid by Greenberg Traurig (which, presumably, would be larger if an attorney billed more hours for the firm).  Petitioners both testified that they were unaware that Mr. Atherton had an improper relationship with ClassicStar.  We find this testimony to be credible.

At trial Mr. Atherton repeatedly claimed that he did not receive improper fees from ClassicStar for bringing prospective clients into the program.  His testimony is clearly untrue.  We believe that Mr. Atherton was similarly dishonest

[*47] with petitioners in an attempt to earn their trust. Although Ms. Lintz alerted petitioners to the possibility that Mr. Atherton might not be independent of ClassicStar, it is not clear exactly what she told them. In addition, petitioners had a number of reasons for continuing to trust Mr. Atherton, including: (1) Ms. Lintz's letter dated February 10, 2004, in which she told petitioners that an independent expert had told her that ClassicStar had "come on strong in the last couple of years" and that there had been "No scandals thus far"; (2) that Mr. Atherton was open with petitioners about the fact that his firm was representing ClassicStar with regard to other matters; (3) that Mr. Atherton had already informed petitioners that ClassicStar would pay their legal fees for work done by Mr. Atherton with respect to their participation in the program; and (4) that Mr. Atherton seemingly demonstrated his independence from ClassicStar by alerting petitioners to the fact that not all the horses on the first schedule of horses were thoroughbreds (a fact it seems ClassicStar was not up-front about). However, we believe the most important fact supporting petitioners' trust in Mr. Atherton was the fact that they hired Mr. Watson, an experienced C.P.A. independent of Mr. Atherton and ClassicStar, who also told petitioners that their ClassicStar-related expenses were tax deductible.

[*48] We do recognize the fact that Mr. Watson relied upon Mr. Atherton's statement that the NELC loans were recourse loans, when those loans were in fact nonrecourse. However, not only was there no indication that Mr. Watson ever asked petitioners themselves for any information regarding the NELC loans; petitioners were also unaware that the NELC loans were nonrecourse.[18] Mr. Watson was also unaware that Mr. Atherton had a conflict of interest regarding ClassicStar.

We also note that petitioners never told Mr. Watson of the issues involving thoroughbred and quarter horse substitutions. However, there was no indication that Mr. Watson ever requested any information regarding the horses, from either petitioners or Mr. Atherton. Indeed, Mr. Watson's testimony at trial indicated that he received all information and documents which he requested from petitioners. In addition, there was nothing to suggest that petitioners were aware that issues regarding their horse pairings could affect the tax deductions they were claiming.

While a taxpayer familiar with the field of tax would have done several things differently from petitioners, petitioners were not sophisticated or

---

[18]As previously stated, it appears that Mr. Atherton told petitioners the NELC loans were recourse. We have also reviewed the NELC loan documents and believe that it would not be clear to a layperson that the loans were nonrecourse; the notes contain a large amount of technical language discussing items such as "successor interests".

**[\*49]** knowledgeable in the field of tax. Petitioners had good reasons for the trust they placed in Mr. Atherton. Considering the relevant facts, we conclude that petitioners reasonably and in good faith relied on the advice supplied to them by Mr. Watson and Mr. Atherton to assess their proper tax liabilities. Accordingly, petitioners are not liable for the section 6662(a) accuracy-related penalties.

IV. Conclusion

We find petitioners are not entitled to deductions for their horse-breeding expenses incurred through their participation in the program. We further find that petitioners are not liable for accuracy-related penalties under section 6662.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for respondent as to the deficiencies and for petitioners as to the penalties.